JS 44 (Rev 06/17) NIQA 2:18-3459

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet (SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM)

**I. (a) PLAINTIFFS**
WILLIAM P. JOHNSON

**DEFENDANTS**
STONEMOR GP LLC and STONEMOR PARTNERS L.P

**(b)** County of Residence of First Listed Plaintiff Montgomery
*(EXCEPT IN U S PLAINTIFF CASES)*

County of Residence of First Listed Defendant Bucks
*(IN U S PLAINTIFF CASES ONLY)*
NOTE IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jeffrey Campolongo, Law Office of Jeffrey Campolongo, 50 Monument Rd, Ste 101, Bala Cynwyd PA 19004, (484) 434-8930

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U S Government Plaintiff
- ☒ 3 Federal Question *(U S Government Not a Party)*
- ☐ 2 U S Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☒ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer w/Disabilities - Employment
- ☐ 446 Amer w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U S Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U S Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Sarbanes-Oxley Act of 2002, 18 U S C. § 1514A
Brief description of cause:
employment discrimination, retaliation, whistleblowing

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F R Cv P
DEMAND $ > $150,000
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)*
JUDGE ______ DOCKET NUMBER ______

DATE
August 15, 2018
SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG JUDGE ______

AUG 15 2018

NIQA

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: WILLIAM P. JOHNSON, 327 GYPSY LANE GULPH MILLS, PA 19406

Address of Defendant: STONEMOR GP LLC, 3600 HORIZON BLVD., SUITE 100, TREVOSE PA 19053

Place of Accident, Incident or Transaction: Bucks County, PA

18 3459

***RELATED CASE, IF ANY:***

Case Number: N/A Judge: Date Terminated:

Civil cases are deemed related when ***Yes*** is answered to any of the following questions.

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? Yes ☐ No ☑
2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? Yes ☐ No ☑
3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? Yes ☐ No ☑
4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? Yes ☐ No ☑

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: August 15, 2018 *Attorney-at-Law / Pro Se Plaintiff* 82608 *Attorney I.D. # (if applicable)*

**CIVIL: (Place a √ in one category only)**

***A. Federal Question Cases:***

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☑ 11. All other Federal Question Cases
*(Please specify)* Sarbanes-Oxley Act, 18 U.S.C § 1514A

***B. Diversity Jurisdiction Cases:***

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify)*
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
*(Please specify)*

**ARBITRATION CERTIFICATION**

*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Jeffrey Campolongo, counsel of record *or* pro se plaintiff, do hereby certify

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs

☑ Relief other than monetary damages is sought.

DATE: August 15, 2018 *Attorney-at-Law / Pro Se Plaintiff* 82608 *Attorney I.D. # (if applicable)*

AUG 15 2018

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| WILLIAM P. JOHNSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| STONEMOR GP LLC | : | |
| and | : | NO. |
| STONEMOR PARTNERS L.P. | | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks. (x )

| | | |
|---|---|---|
| August 15, 2018 | [signature] | Jeffrey Campolongo, Esquire |
| **Date** | **Attorney-at-law** | **Attorney for** Plaintiff |
| 484-434-8930 | 484-434-8931 | jcamp@jcamplaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

**LAW OFFICE OF JEFFREY CAMPOLONGO**
**BY: JEFFREY CAMPOLONGO, ESQUIRE**
**IDENTIFICATION NO: 82608**
**50 MONUMENT ROAD, SUITE 101**
**BALA CYNWYD, PA 19004**
**484.434.8930**
**484.434.8931 FAX**
**JCAMP@JCAMPLAW.COM**
**WWW.JCAMPLAW.COM**

**COUNSEL FOR PLAINTIFF**

**AXLER GOLDICH LLC**
**BY: MARC A. GOLDICH, ESQUIRE**
**IDENTIFICATION NO: 93055**
**1520 LOCUST ST, SUITE 301**
**PHILADELPHIA, PA 19102**
**P: 267.534.7400**
**F: 267.534.7407**
**MGOLDICH@AXGOLAW.COM**
**WWW.AXLERGOLDICH.COM**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM P. JOHNSON** | : | |
| **327 GYPSY LANE** | : | |
| **GULPH MILLS, PA 19406** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **NO.:** |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| | : | |
| **STONEMOR GP LLC** | : | |
| **3600 HORIZON BLVD., SUITE 100** | : | |
| **TREVOSE PA 19053** | : | |
| **-and-** | : | |
| **STONEMOR PARTNERS L.P.** | : | |
| **3600 HORIZON BLVD., SUITE 100** | : | |
| **TREVOSE PA 19053** | : | |
| **Defendants.** | : | |
| | : | |

## COMPLAINT

## I. INTRODUCTION

Plaintiff, William P. Johnson, alleges through his counsel, the **LAW OFFICE OF**

**JEFFREY CAMPOLONGO** and **AXLER GOLDICH LLC**, that his rights to be free from retaliation under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, as amended, have been violated and avers as follows:

## II. PARTIES

1. Plaintiff, William P. Johnson (hereinafter referred to as "Mr. Johnson"), is an adult individual, who resides at the above captioned address.

2. Defendants herein are StoneMor GP LLC and StoneMor Partners L.P. located at, and operating out of, 3600 Horizon Blvd., Suite 100, Trevose PA 19053. Defendants hereafter shall be collectively referred to as "Defendant StoneMor"), all of whom constituted Plaintiff's "joint employer."

3. Defendant StoneMor is an employer covered under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, as amended. Upon information and belief, Defendant StoneMor is publicly traded on the New York Stock Exchange (NYSE symbol STON).

4. Upon information and belief, and according to its website, StoneMor Partners L.P. is the second largest owner and operator of cemeteries in the United States. The Company operates 316 cemeteries and 100 funeral homes in 27 states and Puerto Rico. The cemetery products include burial lots, lawn and mausoleum crypts, burial vaults, caskets, memorials and services to provide for the installation of the cemetery merchandise. The Company is headquartered in Trevose, Pennsylvania, and was founded in 1999. StoneMor completed an IPO in September 2004 and is the only publicly traded deathcare company structured as a Master Limited Partnership. As an MLP, STON benefits from the favorable tax treatment provided by this structure, which in turn allows unit holders to enjoy a high current yield on their units and realize tax- deferred distributions for as long as they hold their

investment. StoneMor's goal is to generate increasing distributable cash flow for its unit holders through acquisitions, pre-need and at-need sales of interment rights, cemetery merchandise and services, and income and gains from managed trusts.

5. Defendant StoneMor does business throughout the Commonwealth of Pennsylvania, including the Eastern District of Pennsylvania, with a corporate office at the above-captioned address.

## III. JURISDICTION and VENUE

6. Plaintiff incorporates by reference the previous paragraphs as if the same were set forth more fully at length herein.

7. Jurisdiction is conferred upon this Honorable Court by 28 U.S.C. § 1337 relating to "any civil action or proceeding arising out of any act of Congress regulating commerce," 28 U.S.C. § 1343(4), and 28 U.S.C. § 1331. This action is authorized and instituted pursuant to the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, as amended.

8. Mr. Johnson exhausted his administrative remedies when he submitted a verified complaint to the United States Department Of Labor, Occupational Safety And Health Administration ("OSHA") on or about November 16, 2017 (OSHA Case No. 3-0110-18-015).

9. More than 180 days have elapsed since the filing of the OSHA complaint, thus Mr. Johnson is entitled to bring his claims pursuant to the Sarbanes-Oxley Act against Defendant StoneMor.

10. Venue is appropriately laid in the United States District Court for the Eastern District of Pennsylvania inasmuch as all parties regularly conduct business within this District and the acts complained of by Plaintiff arose herein.

## IV. FACTS

11. Plaintiff incorporates by reference the previous paragraphs as if the same were set forth more fully at length herein.

12. Plaintiff was employed as the National Vice President of Sales in the Insurance Division of Defendant StoneMor.

13. Plaintiff began working for Defendant StoneMor in May 2014 and was specifically hired for the purpose of creating and leading a new insurance division for Defendant in all states except Florida.

14. By way of background, the state of Florida was considered a "Trust" state for StoneMor, and from the time that Plaintiff was hired he was told that StoneMor did not sell insurance in Florida.

15. Prior to Plaintiff's hire, Ken Lee, Vice President of Operations – Funeral Home Division, was responsible for Trust sales in Florida.

16. Mr. Lee signed a three-year exclusive contract with a third party, Golden Considerations, to sell PreNeed Life Insurance on behalf of StoneMor.

17. In August 2014, Paul Berkey, Regional Vice President of Sales in the Insurance Division of Defendant StoneMor, notified Plaintiff (who was his supervisor) that PreNeed sales were appearing on StoneMor's production reports from Golden Considerations, StoneMor's exclusive General Agent at the time. These sales were on the report under a StoneMor funeral home named Palm Beach National.

18. Plaintiff had no knowledge of these sales and had never heard of Palm Beach National.

19. On or about August 6, 2014, Mr. Berkey sent an email to Carrie Lombardo, Ken Lee's administrative assistant asking if she could provide any insight on why these sales (in Florida) were showing up on StoneMor's production report.

20. Ms. Lombardo did not respond to Mr. Berkey's email, rather, she forwarded Mr. Berkey's email directly to Ken Lee.

21. Ken Lee also did not respond to Mr. Berkey, rather, he emailed Plaintiff directly, including the email correspondence between Ms. Lombardo and Mr. Berkey. Ken Lee requested that all questions regarding previous sales in Florida were to be directed to him and not Carrie Lombardo.

22. Plaintiff then emailed Ken Lee directly, asking him for more information about the Palm Beach National PreNeed sales. Ken Lee did not respond.

23. The Insurance Division never got a clear explanation of these Palm Beach National PreNeed sales.

24. In March 2016, Plaintiff terminated the agreement with Golden Consideration and signed a new exclusive agreement with Forethought Life Insurance Company (now Global Atlantic) (hereafter "Forethought"). As a result, all life insurance business had to be sold through Forethought, per the terms of an exclusive contract between Forethought and StoneMor.

25. StoneMor received a one million dollar cash signing bonus, in exchange for this exclusive agreement with Forethought.

26. This cash signing bonus was not contingent upon meeting any sales volume commitments. It was payable upon execution of the new contract and recorded as revenue in Defendant StoneMor's financial statements.

27. Upon information and belief, this bonus received was never disclosed to the SEC.

28. David Meyers, COO of StoneMor at the time, agreed to pay Plaintiff a $50,000 bonus for bringing in Forethought. This bonus was paid prior to the effective date of the agreement, in Q4 2015.

29. In May 2016, Tom Hirsch, Regional Vice President of Sales for the Southeast Region

was made aware of information that Ken Lee had authorized a third-party (Golden Considerations) to sell insurance in Florida with another insurance company named NGL. This authorization was concealed from StoneMor and the Insurance Division, presumably because it was against company policy to sell insurance in Florida.

30. Specifically, Mr. Hirsch uncovered from a previous conversation that he had with Meryl Risick, an independent agent, that StoneMor was selling PreNeed Insurance out of Palm Beach National. Meryl Risick went on to say that StoneMor was also selling insurance out of funeral homes owned by StoneMor in Florida and using independent insurance agents to do so.

31. Mr. Hirsch was told by Ms. Risick that these agents sold PreNeed insurance business through Tom Bruder and that the PreNeed insurance contracts sold were submitted through NGL and not Forethought.

32. Mr. Hirsch called Plaintiff (his supervisor) to discuss his findings. Plaintiff instructed Mr. Hirsch to schedule a meeting to meet with Tom Bruder to confirm or deny his findings from Meryl Risick. At this time, Plaintiff had never heard of Tom Bruder.

33. During the meeting between Tom Hirsch and Tom Bruder, Tom Bruder alleged that Ken Lee and Bob Rae flew down to Florida to meet with him to discuss PreNeed Insurance sales in Florida, one month after StoneMor acquired Palm Beach National. Ken Lee informed Tom Bruder that selling NGL PreNeed was a potential conflict with StoneMor's exclusive agreement with Forethought, but, regardless of this conflict, he was instructed by Ken Lee to continue selling PreNeed out of StoneMor's funeral homes.

34. Tom Bruder also produced a hard copy of NGL PreNeed insurance production reports to Tom Hirsch that reflected a summary of approximately $1,750,000 worth

of sold PreNeed business dating back to March 2013.

35. Tom Hirsch debriefed Plaintiff after his meeting with Tom Bruder and both agreed that these NGL sales in Florida raised serious potential legal issues with StoneMor's exclusive agreement with Forethought. Both agreed that this matter needed to be reviewed at a higher level within StoneMor's organization.

36. Plaintiff and Tom Hirsch then discussed this situation with StoneMor's Insurance Division Management Team (Paul Berkey, Tom Hirsch, Dion Rumsey, and Eric Bosnyak) where everyone in attendance agreed that this was a problem that needed to be addressed. The management team was very concerned that selling NGL PreNeed insurance violated StoneMor's contract with Forethought and that StoneMor was potentially liable for these actions in Florida.

37. Plaintiff notified David Meyers, StoneMor's COO, of the conflict, discussing the facts in detail. Mr. Meyers advised Plaintiff to first contact John Walls, Senior VP of Sales at Forethought and explain the situation, in an effort to get ahead of the issue. Specifically, Mr. Meyers told Plaintiff, "We can't afford to have another lawsuit."

38. Plaintiff contacted John Walls and explained the situation. Mr. Walls was appreciative of the call and understood that Plaintiff's insurance division was unaware of what was going on in Florida. Mr. Walls was polite but adamant that StoneMor was in breach of contract and that StoneMor was required to cease and desist all NGL PreNeed insurance sold out of StoneMor's funeral homes in Florida.

39. Plaintiff then asked Mr. Walls for permission to fully investigate this conflict. Mr. Walls agreed to give Plaintiff time to do so and Plaintiff assured him that StoneMor would stop selling NGL out of its Florida firms.

40. After Plaintiff's conversation with Mr. Walls, Plaintiff was advised by COO, David Meyers, to contact outside counsel Lewis Hoch for further investigation, which

Plaintiff did.

41. Mr. Meyers also advised Plaintiff that he would have a discussion with CEO, Larry Miller, regarding StoneMor's investigation on lost compensation associated with business sold through NGL.

42. Through further investigation it was discovered that Ken Lee intentionally breached the exclusive contract with Forethought and StoneMor to the tune of $1.75M in insurance sales, costing the company approximately $400,000 of revenue and $275,000 of commissions. Ken Lee also authorized commission payments of approximately $400,000 to be payable to non-StoneMor individuals, Bob Rae and Tom Bruder, of Golden Considerations.

43. Based on the business and personal relationship that Ken Lee had with Bob Rae and Tom Bruder, it was evident to Plaintiff that Ken Lee was self dealing, converting company assets for personal gain, and intentionally misleading the company and his co-workers.

44. Plaintiff met with outside counsel, Lewis Hoch in July, 2016, to discuss this issue in detail.

45. Plaintiff explained to Mr. Hoch, in detail, why he believed the financial misconduct of Ken Lee (in the nature of "fraud") amounted to "stealing from the company."

46. The RVP's in the Insurance Division expressed to Plaintiff that they were very concerned about potential backlash on them and the Insurance Division as a result of reporting Ken Lee's financial misconduct.

47. In July, 2016, StoneMor was pressed to generate cash flow to pay a quarterly dividend. In an effort to generate more cash for the company, David Meyers offered to pay Plaintiff a flat 10% bonus on any cash advance received from Forethought, if Plaintiff could enter into a revised long term agreement. The bonus payable was to

be a percentage on the amount received.

48. StoneMor received a second $1M payment and the bonus owed to Plaintiff was $100,000. This was to be payable in Q4 2016. Larry Miller pressed Plaintiff to get the contract in, so that StoneMor could book the revenue for Q3, 2016. Plaintiff met the deadline and received the signed contract in time to have it count for Q3.

49. COO, David Meyers, was terminated in August, 2016, in connection with his role in the backdating of contracts to make it appear that the cemetery sales results looked better at the close of Q2. Mr. Meyers was terminated prior to Plaintiff receiving the $100,000 bonus. Upon information and belief, the circumstances surrounding Mr. Meyers' termination were not disclosed or otherwise reported to the SEC.

50. On or about August 17, 2016, Ken Lee approached Plaintiff and asked Plaintiff to consider implementing a highly unethical sales practice involving the sale of PreNeed insurance in Indiana. Ken Lee was suggesting that customers in the state of Indiana be charged an additional fee of $1,200 in order to lock in the future costs of a funeral.

51. Plaintiff expressed to Ken Lee that StoneMor already guaranteed the future costs of every funeral to all of its customers who buy PreNeed insurance from StoneMor. By implementing Ken Lee's proposal, a customer in Indiana would be paying for something that is already included for customers in every other state at no additional cost.

52. Ken Lee's motives for implementing this practice were to book additional revenue on the funeral side (i.e., Ken Lee's division) and also that he wanted to pay a sales commission to the sales people for making these sales.

53. In essence, what Ken Lee was suggesting was to charge Indiana customers for something that they had already paid for; book the revenue on his division's P&L;

and pay a commission to sales associates.

54. After hearing this, Plaintiff went to Penny Casey, Vice President of Human Resources, and explained why he believed this practice, as suggested by Ken Lee was unethical and possibly illegal (because it would result in a fraudulent insurance practice known as "rebating.")

55. During this meeting with Ms. Casey, the issue of Ken Lee's financial misconduct also came up and Ms. Casey told Plaintiff that he had a duty as an executive of the company to speak up about the facts of the situation.

56. Plaintiff expressed that he and the Insurance Division feared that they would be retaliated against because of a longstanding friendship between CEO Larry Miller and Ken Lee.

57. Ms. Casey informed Plaintiff that, because financial misconduct, which was in the nature of fraud, was reported, he was protected under the company's whistleblower policy. Shortly thereafter, Ms. Casey was terminated from StoneMor.

58. On August 23, 2016, Plaintiff had a conference call with in-house counsel, Austin So, and outside counsel, Lewis Hoch wherein he presented the facts of the Ken Lee fraud situation.

59. Plaintiff once again explained to Mr. So and Mr. Hoch, why he believed the financial misconduct of Ken Lee amounted to "stealing from the company"; that Ken Lee's actions went well beyond the authority he had to act on behalf of the company; and Ken Lee was lying about his personal self-dealing.

60. Plaintiff also explained that the amounts being converted and/or misdirected by Ken Lee to NGL were not insubstantial and directly impacted the Insurance Division's P&L.

61. A meeting was scheduled for the following day, on August 24th. Plaintiff, Austin So

and Ken Lee were present. Lewis Hoch called into the meeting.

62. As a result of the meeting, Ken Lee was advised by Austin So not to shut anything down until the situation was investigated further.

63. When the meeting concluded, Plaintiff stayed behind to express to Austin So how egregious Plaintiff thought this situation was and that the RVP's in the Insurance Division were extremely concerned about the negative impact and the potential liability these NGL sales would have on the Insurance Division and their employment with StoneMor.

64. Upon returning to his office Plaintiff discovered that Ken Lee had sent an email to Tom Bruder, informing him that the Florida program had ended. In doing so, Ken Lee completely disregarded in-house counsel's specific request to not shut down the program pending further investigation.

65. Because Ken Lee discontinued the Florida NGL PreNeed sales program, it was Plaintiff's responsibility to notify John Walls of Forethought.

66. Mr. Walls mentioned that he had a specific conversation with Ken Lee, three years prior, about the sales activities of Tom Bruder. This conversation between Mr. Walls and Ken Lee occurred shortly after StoneMor acquired Palm Beach National. Mr. Walls reminded Ken Lee of the exclusive agreement between StoneMor and Forethought and if Tom Bruder was to continue to sell PreNeed insurance, it had to be sold through Forethought and not NGL. Per Mr. Walls, Ken Lee confirmed his understanding of the agreement and informed Mr. Walls that StoneMor would not continue the relationship with Tom Bruder and that only Trust would be sold out of StoneMor's Florida funeral homes.

67. At all times material hereto, Defendant StoneMor had a Policy and Procedure for the Reporting of Internal Misconduct (Whistle-Blower Policy) (Revised 10/01/2013),

which Plaintiff utilized.

68. Among the examples of wrongdoing listed, the Policy lists failure to disclose all material off-balance sheet transactions, arrangements, obligations or other relationships in violation of Section 401 of the Sarbanes-Oxley Act of 2002.

69. Furthermore, Defendant StoneMor had a Code of Ethics Policy (revised 03/30/2016), which imposed, *inter alia*, an obligation on the part of Senior Officers to ensure the accuracy and integrity of financial records and periodic reports. Employees are also instructed to avoid any outside financial interest that could influence their corporate decisions or actions.

70. Plaintiff, as well as Ken Lee, among others, were "Senior Officers" under the aforementioned Policy.

71. As acknowledged by Penny Casey, Vice President of Human Resources, Plaintiff made a good faith complaint pursuant to the company's whistleblower policy when he reported that Ken Lee was engaging in unlawful and fraudulent behavior. As such, Plaintiff was not only protected from retaliation under federal law, he was also protected pursuant to company policy.

72. On or about October 19, 2016, Larry Miller came into Plaintiff's office and expressed his frustration in Plaintiff and the Management Team for reporting the Ken Lee issue to the ethics hotline. He said, "you and your guys (meaning RVP's Tom Hirsch and Paul Berkey) should've come to me with this and I would have handled it…now it cost the company over $100,000 to investigate and Bob Helman (Chairman of the Board of Directors of StoneMor) is pissed."

73. In or around November 2016, an investigation was conducted into Ken Lee's arrangement to sell PreNeed Insurance in Florida led by StoneMor board member, Allen Freedman, who was also chair of the Audit Committee.

74. Plaintiff was told by outside counsel Lewis Hoch, as well as Mr. Freedman, that the investigation concluded that Ken Lee knowingly breached the Forethought contract, lied during the investigation, and acted in a highly unethical manner.

75. Per Bob Helman, StoneMor never even determined if fraud occurred because StoneMor was not going to spend any more money to look into Ken Lee's bank account. Larry Miller demanded that the investigation be concluded without spending any more money.

76. Mr. So and Mr. Freedman met with Ken Lee to discuss the findings, conclusions, and recommendations of the Audit Committee. During that meeting, they highlighted conduct by Mr. Lee that the Audit Committee identified as unacceptable.

77. The Audit Committee instructed Larry Miller, to whom Ken Lee reported, to formally reprimand Mr. Lee, noting that: (1) Mr. Lee failed to cooperate fully and openly with Mr. Johnson as the head of the Insurance Division and with the investigation; (2) he did not seek the advice of legal counsel in interpreting whether his actions were permitted under the terms of the Global Atlantic Agreement; and (3) Mr. Lee acted too quickly, and contrary to the request of Mr. So, to end Golden Considerations' sales in Florida.

78. Plaintiff specifically asked Allen Freedman if this financial misconduct (i.e. fraud) investigation was going to be reported to the SEC. Mr. Freedman replied: " I can assure you that we have taken this situation very seriously, we had spent over $100,000 investigating this issue, and I can assure you that we did not whitewash it."

79. The findings of the Ken Lee "fraud" investigation were never reported to the SEC.

80. Defendant StoneMor determined, in its sole discretion, after consultation with

management and counsel, that the findings did not need to be disclosed to the SEC, despite Plaintiff's good faith belief that Ken Lee engaged in fraud on the company and/or its shareholders.

81. Mr. Freedman thanked Plaintiff for raising concerns involving Ken Lee's "fraud" and stated that he believed Plaintiff's concerns reflected those of a responsible corporate citizen.

82. Following this investigation, outside counsel Lewis Hoch informed Plaintiff that CEO Larry Miller was working on a plan with the board of directors to remove Ken Lee from his current position.

83. In February 2017, despite his success in growing the division and procuring an additional $1,000,000 from Forethought in exchange for a long term exclusive contract and securing $2,000,000 from StoneMor's insurance provider within a 12-month period, Plaintiff received an email from Larry Miller stating that the board of directors were concerned that the Insurance Division, managed by Plaintiff, would not become a significant contributor to the company long term.

84. Plaintiff was asked to present a plan to StoneMor's board concerning the Insurance Division, which Plaintiff did on or about March 7, 2017.

85. At the board meeting, Plaintiff reported that his division increased sales by 35% over the past two years. The sales projections for 2017 called for explosive growth. The division was set to grow by 245% by the end of 2017 with $34M in sales versus $10M in sales from 2016. Based on these projections, the expectation was to earn a profit from $7.8M in revenue. Plaintiff also reported that insurance policies that were sold over the past three years generated over $4M of claims dollars that were paid to StoneMor funeral homes.

86. Almost immediately after presenting to the board, Plaintiff began to feel like he was

being unduly scrutinized by Allen Freedman (who headed the Ken Lee investigation).

87. Feeling uncomfortable about Mr. Freedman's intent, Plaintiff sent an email on March 23, 2017 to Austin So, Chief Legal Counsel, asking if he was being retaliated against for exposing Ken Lee's financial misconduct. Austin So responded, stating that "there will be no retaliation against you or any other employee."

88. By reaching out to StoneMor's Chief Legal Counsel, Plaintiff was once again engaging in protected activity.

89. On or about April 21, 2017, Mark Miller, CFO, threatened Plaintiff's job. This happened twice in a three-day period. Mark Miller also threatened to shut down the Insurance Division.

90. These threats, made in front of three other employees, were laced with profanity, anger and intended to intimidate Plaintiff.

91. As a result Plaintiff made a formal complaint with Gina Manzi, Vice President of Human Resources, regarding the threats made by Mark Miller. This complaint was not followed up on.

92. Plaintiff also sent an email to Larry Miller and to Leo Pound, acting COO, that Mark Miller's behavior was completely unprofessional, unacceptable and should not be tolerated.

93. On or about May 14, 2017, Mr. Pound put a hiring freeze on the Insurance Division while the division was in growth mode in Florida. Mr. Pound said he needed to be comfortable with the financial model before adding more people.

94. On May 15, 2017, Plaintiff went to lunch with Mr. Pound, to discuss the Insurance Division in further detail.

95. On or about May 16, 2017, StoneMor offered the permanent CFO job to Mark Miller.

Also announced was new CEO, Paul Grady.

96. On or about July 25, 2017, Mr. Pound called Plaintiff into his office and bashed him again for the Insurance Division not turning a profit and asked Plaintiff to consider firing half of the management team and half of the sales people. Plaintiff told Mr. Pound that that decision would be unwarranted and that he did not agree with that approach.

97. On or about July 26, 2017, in a meeting with Mr. Pound, Paul Grady (the new CEO) and Insurance Division Management Team, Mr. Pound said in front of the group, the management structure is too expensive and unless sales increase, there are duplicate expenses across all divisions and changes will need to be made.

98. During that meeting, Plaintiff presented YTD sales production numbers of $11M which Paul Grady adamantly refuted saying, "my report shows your division at $4M."

99. Mr. Grady indicated that he received the report from Ken Lee. Plaintiff produced a hard copy of the production report to demonstrate to Mr. Grady that YTD sales were actually $11M. In response, Mr. Grady apologized to Plaintiff, as it was evident to all at the meeting that Ken Lee provided a falsified report that was $7M short of actual results.

100. On or about July 29, 2017, Plaintiff received the June financial reports for the Insurance Division. It was apparent that the financials were altered to show a loss, otherwise, the core insurance division turned a profit.

101. Mark Miller, CFO, instructed Nick Keane in accounting, to assess a "one time" $210,000 loss for a "chargeback reserve." This occurred after the core business turned a profit in June 2017. With this action, the division appeared to be losing money.

102. Plaintiff raised serious concerns about the chargeback and sent an email to Larry Miller, stating that this was an overtly apparent move on Mr. Miller's part to remove Plaintiff from the organization.

103. The chargeback being assessed was inaccurate and misleading insofar as Plaintiff's P&L had already accounted for chargebacks in the Insurance Division's financial statements.

104. On or about August 14, 2017, Plaintiff sent an email to Paul Grady and Leo Pound stating that the Insurance Division had the best week in sales in company history—making over $520,000 in sales.

105. On or about August 16, 2017, Plaintiff presented an Insurance Division update to the board of directors. Plaintiff explained that the division was "on a roll" from a sales perspective and starting to turn a profit. Plaintiff referenced that he did not understand the $210,000 chargeback. Seeking an explanation, Bob Helman, Chairman of the Board, questioned Leo Pound. Mr. Pound responded, "we're still looking into it, but at a minimum, this chargeback is a one-time assessment."

106. Following Plaintiff's presentation, the board members appeared impressed by Plaintiff's division's results. To that end, Bob Helman, Pete Talbot (board member), Larry Miller (former CEO), Bob Kupitz (in-house counsel) and Dina Kelly (National Vice President of Cemetery Sales) all expressed very high praise for Plaintiff and the Insurance Division.

107. On August 23, 2017, despite his outstanding performance, Plaintiff was fired from StoneMor. Plaintiff was informed by Paul Grady that his firing was the result of a division merger.

108. Mr. Grady then informed Plaintiff that the newly combined division was going to be managed by Ken Lee and Mr. Lee was being awarded Plaintiff's title as "National

Vice President."

**COUNT I**
**SARBANES-OXLEY ACT OF 2002,**
**18 U.S.C. § 1514A, *et seq.***
**WHISTLEBLOWER RETALIATION**

109. Plaintiff incorporates by reference the previous paragraphs as if the same were set forth more fully at length herein.

110. At all material times, Plaintiff has been subjected to adverse employment action by Defendant based on his status as a whistleblower, including but not limited to: disparate treatment, retaliation, and wrongful termination.

111. Plaintiff engaged in protected activity on multiple occasions, including but not limited to: raising compliance issues with management, collecting evidence of violations, communicating with appropriate enforcement authorities to report violations, refusing to engage in unlawful conduct, and raising compliance concerns with others who might reasonably have been effective at commencing enforcement proceedings.

112. For the duration of employment, Defendant either knew of Plaintiff's protected activity, or suspected him of engaging in protected activity.

113. In reporting substantial, material financial misconduct in the nature of fraud to management authorities, including but not limited to human resources, in-house counsel, outside counsel, the Audit Committee and many others, Plaintiff acted with a reasonable belief and in good faith as a whistleblower.

114. It was objectively reasonable that the actions complained of herein by Plaintiff constituted either an act of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. §1343), bank fraud (18 U.S.C. § 1344), securities fraud (18 U.S.C. § 1348), or

violation(s) of a SEC rule or regulation or federal law relating to fraud against shareholders. *See* 18 U.S.C. § 1514A(a).

115. Plaintiff's reasonable belief that he was reporting fraud was both subjectively reasonable in light of his training and experience as an executive of the company, and objectively reasonable for an individual in his circumstance having his training and experience, as evidenced by Defendant's corrective actions against Ken Lee, as well as Defendant's admission that Plaintiff's concerns reflected those of a responsible corporate citizen.

116. Plaintiff's use of the Defendant's Policy and Procedure for the Reporting of Internal Misconduct (Whistle-Blower Policy) provided additional protection from retaliation.

117. The totality of the circumstances make clear that Plaintiff's complaints of fraud relating to Ken Lee, as well as other reported instances of financial misconduct, were a contributing factor in his termination.

118. The alleged reasons provided for terminating Plaintiff's employment were merely a pre-text for unlawful retaliation under the Sarbanes-Oxley Act.

119. As a direct and proximate result of Defendant's unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has been deprived of economic and non-economic benefits including, but not limited to wage loss, pain and suffering, mental anguish, humiliation, loss of fringe benefits, painful embarrassment among his friends and co-workers, disruption of his personal life and loss of enjoyment of the ordinary pleasures of life.

**WHEREFORE**, Plaintiff requests that the Court grant him the following relief against Defendant:

a. Damages in a sum to exceed $150,000.00 for past and future monetary losses as a result of Defendant's unlawful discrimination;

b. Reinstatement or front pay, back pay, raises, bonuses, benefits, overtime, reinstatement of seniority and tenure, and other orders necessary to make Plaintiff whole;

c. Compensatory damages;

d. Emotional pain and suffering;

e. Reasonable attorneys' fees;

f. Recoverable Costs;

g. Pre and post judgment interest;

h. An allowance to compensate for negative tax consequences;

i. An order (1) requiring Defendant to abate and refrain from any further violations of the whistleblower provisions of the Acts; (2) requiring Defendant to explicitly rescind any and all policies that restrain or direct employees in connection with reporting of compliance issues; (3) requiring Defendant to prohibit harassment of those who engage, or are suspected of engaging in protected activity; and (4) requiring Defendant to take prompt and effective action against any reported violations;

j. An order expunging Plaintiff's termination, and ordering Defendant to remove any records of disciplinary action against Plaintiff, to preserve them only in the files of their legal counsel, and to use them only for purposes of defending rights in this proceeding; and

k. An order prohibiting Defendant from disclosing any disparaging information about Plaintiff to prospective employers, or otherwise interfering with any employment applications he might make in the future.

**RESPECTFULLY SUBMITTED**,

August 15, 2018
Date

**By:** [JC3646 - Validation of Signature Code]

Jeffrey Campolongo, Esquire
**LAW OFFICE OF JEFFREY CAMPOLONGO**
50 Monument Road
Suite 101
Bala Cynwyd, PA 19004
484-434-8930
484-434-8931 fax

Marc A. Goldich, Esquire
**Axler Goldich LLC**
1520 Locust St, Suite 301
Philadelphia, PA 19102
P: 267.534.7400
F: 267.534.7407

***Counsel for Plaintiff***